## S13A1251. KIPP v. THE STATE.
### (751 SE2d 83)

HINES, Presiding Justice.

Deanna Renee Kipp ("Kipp") appeals her convictions and sentences for four counts of felony murder, one count of involuntary manslaughter, two counts of cruelty to children in the first degree, one count of concealing the death of another, and two counts of making false statements in connection with the abuse and resulting death of her 18-month-old daughter, Kaylee Kipp, and the abuse of her two other minor daughters, S. K. and A. K. She contends that the jury's verdicts of felony murder and its verdict of involuntary manslaughter were mutually exclusive, and that the trial court erred in its imposition of sentences. Finding the challenge of mutually exclusive verdicts to be without merit, but that there was error in the sentencing, the judgments of convictions are affirmed and the case is remanded to the trial court for resentencing.[1]

---

[1] The crimes occurred on June 11, 2011. On September 7, 2012, a Hall County grand jury returned a 14-count indictment against Kipp: Count 1 – as a party to the malice murder of Kaylee through the application of force causing swelling of the brain; Count 2 – as a party to the felony murder of Kaylee while in the commission of aggravated assault as alleged in Count 3; Count 3 – as a party to the aggravated assault of Kaylee with a blunt object causing swelling of the brain; Count 4 – as a party to the felony murder of Kaylee while in the commission of cruelty to children in the first degree as alleged in Count 5; Count 5 – as a party to cruelty to children in the first degree by application of force against Kaylee causing swelling of the brain; Count 6 – felony murder of Kaylee while in the commission of cruelty to children in the first degree as alleged in Count 7; Count 7 – cruelty to children in the first degree by failing to seek medical care for Kaylee; Count 8 – felony murder of Kaylee while in the commission of cruelty to children in the second degree as alleged in Count 9; Count 9 – cruelty to children in the second

The evidence construed in favor of the verdicts showed the following. Emergency responders entered Kipp's apartment around 12:30 p.m. on June 12, 2011, and found no adults but only the body of the deceased toddler Kaylee lying in her crib. She was cold to the touch, and in full rigor mortis. Later, another responder encountered Kipp in the apartment, and she told him that she had checked on Kaylee around 8:00-9:00 a.m., and that Kaylee looked up at her from her crib, and went back to sleep. Kipp did not ask any questions about Kaylee's condition and was not visibly upset.

That morning Kipp had approached a man and asked to borrow his cell phone to call 911. The man observed Kipp while she was on the phone with 911 talking about Kaylee. When the 911 operator instructed Kipp to reach into Kaylee's crib, she "tried like she was wanting to try to help the baby, like she couldn't do it." Kaylee was face down in the crib when Kipp was on the phone with 911.

When police responded to the scene to assist paramedics, they had to seek out Kipp and found her standing outside the apartment. She advised them that they could not enter her apartment because she had mistakenly locked the door. It appeared to police as if Kipp was trying to guard her door by telling them it was locked. Kipp's demeanor "didn't appear right" and was "almost forced"; at times Kipp uttered what seemed like a "fake cry." Neither Kipp nor her live-in boyfriend, Stephen West, exhibited any signs of emotion when West arrived at the scene, nor did they ask each other questions about what had occurred. Kipp and the rest of her family went to the police station, and Kipp still did not exhibit any signs of grief.

Following Kaylee's death, Kipp's other two daughters, S. K., age 7, and A. K., age 4, were examined and interviewed by a nurse

---

degree by negligently failing to seek medical care for Kaylee; Count 10 – cruelty to children in the first degree by causing S. K. cruel and excessive mental pain by having S. K. "check on" Kaylee, knowing that Kaylee was deceased; Count 11 – as a party to cruelty to children in the first degree by maliciously causing S. K. and A. K. excessive physical and mental pain by repeated beatings and other physical abuse; Count 12 – concealing the death of another; Count 13 – false statement by lying to police during a June 12, 2011 interview; and Count 14 – false statement by lying to police during a June 13, 2011 interview. Kipp was tried before a jury October 22-November 2, 2012, and found guilty of all charges with the exception of malice murder as alleged in Count 1; on Count 1, the jury returned a verdict of guilty of the offense of involuntary manslaughter. On November 15, 2012, Kipp was sentenced to concurrent terms of life in prison on Counts 2, 4, 6, and 8; a concurrent ten years in prison on Count 1; twenty years in prison on Count 3; a concurrent 20 years in prison on Count 10; 20 years in prison on Count 11, to be served consecutively to the sentence on Count 10; five years in prison on Count 12, to be served consecutively to the sentence on Count 11; five years in prison on Count 13, to be served consecutively to the sentence on Count 12; and five years in prison on Count 14, to be served consecutively to the sentence on Count 13. A notice of appeal was filed on December 10, 2012, and the case was docketed in this Court in the April 2013 term. The appeal was submitted for decision on the briefs.

practitioner trained in evaluating children who were potential victims of abuse. The nurse practitioner observed and documented the girls' numerous physical injuries and determined that they were consistent with signs of child abuse. During interviews with a child psychologist, the girls expressed their fear of West. S. K. also related that Kipp knew about severe spankings by West and that Kipp was with West when he made Kaylee cry on the night before her death.

The girls were placed in a temporary foster home after their sister's death, and they told their foster mother that they were not allowed to go outside and play, that West spanked them on many occasions, and that on S. K.'s birthday he "came into her room and pushed her face into a pillow, pulled her pants down and whooped her on her butt." S. K. also told her foster mother that she heard Kaylee being spanked on the night of the murder, and that Kipp told her the next morning to go check on Kaylee; S. K. found Kaylee cold to the touch. S. K. later told her second foster mother that Kaylee was thrown into her crib "like a basketball." She related how she had found Kaylee dead and often expressed her fear that she or A. K. would also die. Both girls had recurring nightmares.

A child protective services investigator with the Department of Family and Children Services accompanied S. K. and A. K. to Kaylee's funeral, and S. K. told the investigator that West "tried to kill [her]," explaining that West would hold the girls' heads into pillows "if they were bad." S. K. also stated that she told Kipp about West's behavior but that Kipp "told her to stop joking." When the investigator told Kipp that S. K. and A. K. were going to be put in foster care, Kipp's only response was "okay."

Kipp admitted to one investigator that she saw West spank the children with significant force, put his hands over their mouths, and force Kaylee's face into the pad of her crib. During another police interview, Kipp stated that now "she had the family she always wanted." She also related that she saw West spank the children on the night of Kaylee's murder and watched as West pushed Kaylee's face into the crib. Kipp continuously presented a time line of events on the night of Kaylee's death which contradicted the physical evidence including the stage of rigor mortis of Kaylee's body at the time paramedics arrived.

A forensic child pathologist reviewed the reports of injuries sustained by S. K. and A. K. and found them consistent with the abuse described by the children. The pathologist also reviewed the findings of the autopsy on Kaylee and opined that the pooling of blood on the front of Kaylee's body was consistent with her being on her belly and pressed against an object like the mattress or pad of her

crib; the toddler had sustained injuries to her head and neck consistent with blunt force trauma, knuckle marks from a person's hand, and considerable impact or pressure. Kaylee's autopsy revealed at least six distinct areas of impact inside her scalp. Her death was caused by multiple injuries to her head consistent with blunt force trauma which caused her brain to swell or asphyxiation or a combination of both. Kaylee's death was not immediate, and her suffering was likely prolonged. Kaylee might have survived if she were given immediate medical attention to reverse the swelling in her brain.

1. The evidence was sufficient to enable a rational trier of fact to find Kipp guilty beyond a reasonable doubt of the crimes for which she was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Kipp contends that the verdict of involuntary manslaughter and the verdicts on each count of felony murder are mutually exclusive. But, the contention is unavailing.

It is unnecessary that there be consistency in the jury's verdicts, for each count in an indictment is regarded as if it were a separate indictment. *Lawrence v. State*, 265 Ga. 65, 67 (2) (453 SE2d 733) (1995). And, as Kipp acknowledges, verdicts of guilty of felony murder and involuntary manslaughter are not mutually exclusive as a matter of law. *Smith v. State*, 267 Ga. 372, 376 (6) (477 SE2d 827) (1996). However, the inquiry does not end there inasmuch as both felony murder, OCGA § 16-5-1 (c),[2] and involuntary manslaughter, OCGA § 16-5-3 (a),[3] are predicated upon the commission or omission of another offense or act; mutually exclusive verdicts may occur where the offenses or acts alleged in the indictment underlying the felony murder and involuntary manslaughter counts reflect that the jury, in order to find the defendant guilty on both counts, necessarily reached "two positive findings of fact that cannot logically mutually exist." *Flores v. State*, 277 Ga. 780, 783 (3) (596 SE2d 114) (2004), quoting *Jackson v. State*, 276 Ga. 408, 410 (2) (577 SE2d 570) (2003). And, this is what Kipp claims occurred in her case, that is, that the verdicts reflect that the jury may have found that she acted with both

---

[2] OCGA § 16-5-1 (c) provides:
　　A person also commits the offense of murder when, in the commission of a felony, he causes the death of another human being irrespective of malice.

[3] OCGA § 16-5-3 (a) provides:
　　A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

criminal intent and criminal negligence in connection with Kaylee's death. In order to determine whether this occurred, there must be scrutiny of the alleged underlying offenses or acts. *Flores v. State*, supra at 783 (3).

(a) *Count 1 and Count 2*

In Count 2, Kipp was found guilty of felony murder while in the commission of aggravated assault by use of a blunt object or instrument, which caused Kaylee's brain to swell. Certainly felony murder requires that the accused have the criminal intent to commit the underlying felony, in this case, aggravated assault. See *Chapman v. State*, 275 Ga. 314, 316 (3) (565 SE2d 442) (2002). And, Kipp was charged with and found guilty of aggravated assault with an instrument used offensively against a person, as set forth in OCGA § 16-5-21 (a) (2). *Chapman v. State*, supra at 317 (3). However, the simple assault encompassed within aggravated assault may be committed in two ways: when a person "[a]ttempts to commit a violent injury to the person of another," OCGA § 16-5-20 (a) (1), or when a person "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." Id. at (a) (2). And, the presence of criminal intent is required for an assault under OCGA § 16-5-20 (a) (1). In contrast, a conviction for reckless conduct, which was the basis for the involuntary manslaughter verdict, requires criminal negligence. *Jackson v. State*, supra at 411 (2). Kipp argues that the language of the indictment was broad enough to charge her with felony murder based upon an aggravated assault premised on a simple assault under either subsection (a) (1) or (a) (2) of OCGA § 16-5-20, that the evidence was sufficient to support a verdict under either subsection, and that the jury was instructed on both provisions; therefore, it is impermissible to make the finding that the felony murder verdict rested solely upon OCGA § 16-5-20 (a) (2), and thereby eliminate the "reasonable possibility" that the jury found that she acted with both criminal intent and criminal negligence in the conduct causing Kaylee's death. But, Kipp's argument misses the mark.

> The rule against mutually exclusive verdicts applies only where the convictions result from the same act involving the same victim at the same instant. [Cits.] Where the victim sustains several injuries, convictions for both intentional and negligent crimes are not mutually exclusive. [Cits.]

*Waits v. State*, 282 Ga. 1, 3 (2) (644 SE2d 127) (2007). In this case, the verdicts at issue are supported by evidence of separate acts, committed at separate moments during the night Kaylee was killed, and

thus, are not mutually exclusive. As noted, Kipp was indicted in Count 1 for malice murder as a party to the crime, for causing Kaylee's death through the application of force causing swelling to her brain; however, the jury found her guilty of involuntary manslaughter as a lesser included offense. The evidence showed that Kaylee was hit multiple times in the head, that her face was forced into the bottom of her crib, and that she died as a result of brain swelling caused by blunt force trauma to the head and asphyxiation. Thus, the jury could have found that the child's death was caused by a series of injuries sustained at various moments on the night of the murder, and that some of Kipp's conduct in regard to her boyfriend's application of force to Kaylee's head, amounted only to criminal negligence, and thus, reckless conduct. As the abuse escalated in severity, the jury could have then found that Kipp's culpability increased to the level of criminal intent.

(b) *Count 1 and Count 4*

In Count 4, Kipp was found guilty as a party to felony murder based on cruelty to children in the first degree, by inflicting on Kaylee cruel and excessive physical and mental pain by application of force causing swelling of the brain. Kipp urges that the finding of guilt on this count, which cannot be committed by criminal negligence, as well as that for involuntary manslaughter, reflects that the jury necessarily reached two positive findings of fact that cannot logically mutually exist.

But, here again Kipp's argument fails. The verdicts for involuntary manslaughter and felony murder while in the commission of cruelty to children in the first degree are not mutually exclusive as the evidence authorized the jury to conclude that Kipp aided her boyfriend, by omission or commission, to perpetrate various and numerous acts of abuse against the victim at different moments during the time preceding her death. Indeed, the evidence authorized the jury to conclude that Kipp committed both non-felony acts of abuse that inadvertently led to or contributed to her daughter's death and others that constituted felony cruelty to children, which would have provided the foundation for the felony murder conviction on Count 4. *Smith v. State*, 288 Ga. 348, 350 (4) (703 SE2d 629) (2010).

(c) *Count 6 and Count 8*

In these counts, Kipp was found guilty of felony murder based on her failure to seek medical care for Kaylee. Kipp asserts that these verdicts are both legally and logically mutually exclusive because Count 6's felony murder conviction is based on child cruelty in the first degree for maliciously failing to seek medical care for the victim,

while Count 8's felony murder conviction is based on child cruelty in the second degree for negligently failing to seek medical care for the victim.

However, here again the assertion that the verdicts are mutually exclusive is unavailing. The evidence is that Kaylee's death was caused by multiple injuries from various forms of abuse during the night of her death. A rational trier of fact could conclude that Kipp's initial behavior in failing to seek out medical attention for her daughter following some of the abuse was criminally negligent but that as the night progressed, and more physical abuse occurred, her independent and ultimate decision not to call for help rose to the level of criminal intent.

3. As noted, the superior court sentenced Kipp on each felony murder count. However, the prohibition against double jeopardy does not permit a defendant to be punished on multiple murder counts for a single homicide; indeed, when a defendant is found guilty on multiple murder counts for a single victim, the additional counts are rendered surplusage and must be vacated. *Brady v. State*, 283 Ga. 359, 360 (659 SE2d 368) (2008). So too, it was error for the trial court to sentence Kipp for involuntary manslaughter in light of the convictions for felony murder, for there was but one homicide. *Smith v. State*, supra at 377 (9). And, Kipp was incorrectly sentenced on the aggravated assault charge in Count 3 which was the underlying offense for the felony murder charge in Count 2. See *Malcolm v. State*, 263 Ga. 369 (434 SE2d 479) (1993). What is more, inasmuch as the sentences on Counts 10 through 14, are to be served either concurrently with or consecutive to sentences which must be vacated as a matter of law, Kipp must be resentenced on all counts for which a sentence may be properly imposed.

*Judgments affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*

DECIDED NOVEMBER 4, 2013.

*Travis A. Williams, H. Bradford Morris, Jr.*, for appellant.

*Lee Darragh, District Attorney, Kelley M. Robertson, Lindsay H. Burton, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General*, for appellee.